Our second case this morning is Johnson v. Enhanced Recovery Company. Mr. Adelman, if you would pause for one moment while we clear the courtroom here. Apparently that case before yours excited the interest of a lot of people in the community. May it please the court. Counsel. Enhanced Recovery sent a collection letter on Thursday, April 21, 2016, offering three settlements, which the consumer had to remit by May 26, 2016. After stating the three options, it said we're not obligated to renew this offer. This letter serves as notification that your delinquent account may be reported to the National Credit Bureau. Payment of the offered settlement amount will stop collection activity on this matter. And then it notes that it will not restore your service with the telecom carrier. If you want to do that, you must pay in full. Mr. Adelman, are you maintaining that the letter should have stated that the debt had already been reported to the National Credit Bureau? It should have stated that it either had been reported, because by the time you get it, yes. That would have been false, given that the debt had not at that point yet been reported. Or it could have stated we are in the process of reporting your debt. The issue arises because the reporting took place on Sunday, April 24. If you look at it from the standpoint of when the consumer opens the letter and has a chance to act on it, yes, at that point it has already been reported. So any of those, either saying that it had been reported or that it is in the process of being reported, would have been more accurate than what was stated. Why is the time the debt is reported to the National Credit Bureau's even material under the FDCPA? The letter simply states that delinquent debts may be, quote, may be reported, which is something that truly even the most unsophisticated consumer would know, isn't it? The defendant testified what the intent of the letter was, in particular in connection with the March letter. And they stated that we wait 33 to 45 days before reporting to, quote, to allow the 1692G notice to be received and a consumer to be able to respond prior to the credit reporting. Although that's not a legal requirement. We do that sometimes because clients want us to and have it in our statement of work, and other times because it's best practice. So ERC intended to threaten to damage credit if you don't pay. So, yes, under the circumstances it is highly material. Credit reporting is important to consumers. A statement, we will damage your credit if you don't pay, coupled with a specific future date, is very material. They're demanding money upon paying of credit reporting, and what they're not saying is we've already, by the time you get this, your credit will already have been damaged. Nothing you can do will prevent that. And they're asking you to pay $900. Yes, that's material. Now, you cite cases for the proposition that ambiguity standing alone violates the FDCPA, but we've never held as much, have we? I disagree. In Pantoya, this court held that the defendant was liable. It was affirming a summary judgment for the plaintiff, even though, quote, we are not sure that the only reasonable way to read defendant's letter is the one suggested, but, quote, we are confident that that is one reasonable way to read it, close quote. And then where the FDCPA requires clarity, ambiguity itself can prove a violation. And that is one of a number of cases in which this court has so ruled. For example, in Voucher, this court held just last year that, quote, debt collectors are required to tailor boilerplate language to avoid ambiguity, close quote. In Locke's, this court approves a statement from the Ninth Circuit that if language, quote, can reasonably be interpreted to imply that the debt collector will take action, it has no intention or ability to undertake. The debt collector that fails to clarify that ambiguity does so at its peril, close quote. And there are others we cite in our briefs, McMahon and Shoeway. So, yes, I think that an ambiguous statement does violate the FDCPA. You know, I need you to really explain something to me. I find at this point, but you can change my mind, Mr. Edelman, you have many times in the last 35 years. I found the interpretation of the letter odd because it strings together the three main discrete pieces of information. First of all, the fact that the outstanding debt and options for settling it. Secondly, the fact that the debt is reportable to credit bureaus. And thirdly, that the fact that paying one of the offered settlement amounts will stop collection activities on the debt. And from these three largely unrelated points, Johnson would have the court assume that the message to the unsophisticated consumer is that payment by the first listed date will prevent the debt from being reported to credit bureaus. The letter conveys three facts about her debt, all of which are true. The letter was put together by the defendant with those statements in it. It is meant to convey an integrated message. The defendant's witness testified in connection with the first of the three letters that that was the intended meaning. So the defendant is now contending that the meaning which it admittedly sought to convey with the first of these letters is not reasonably derived from the second of the letters. There was no requirement, for example, that they say anything about whether the debt would be reported to national credit bureaus. The defendant is not a financial institution as defined in the Fair Credit Reporting Act and is under no obligation whatsoever to make any statement on that subject. It nevertheless chose to do so and to wedge that one sentence in between pay the settlement by a certain date and payment of the offered settlement amount will stop collection activity on this matter. It then elaborates on what payment of the settlement amount will do. It will not restore your service. For that, you have to pay in full, but it will stop collection activity. The necessary implication of wedging in the gratuitous credit bureau statement in between the other two statements is that the collection activity includes credit bureau notification, and that's what the defendant's witness testified was the intent of the letter. The district judge recognized in denying the motion to dismiss that this is a reasonable interpretation of the letter. The reason we lost in summary judgment is that the district court decided, and I submit erroneously, that extrinsic evidence is required where the district judge perceives that a statement is ambiguous on its face, and that is not correct. This court has explained, for example, in Taylor v. Cavalry, that you need extrinsic evidence where, quote, a judge might be mistaken in supposing that a letter that was clear to him was clear to unsophisticated debtors, and so it is open to a plaintiff in any but the clearest case to present objective evidence of confusion, for example, the results of a consumer survey, close quote. But here the district judge stated that this letter bears the meaning which we propose to be put on it. It is, at a minimum, ambiguous, if not outright false. Furthermore, that meaning was that admittedly intended by the defendant. What evidence is there that collection activity is synonymous with credit reporting? Determining whether a consumer would interpret that phrase in such a way is precisely the reason that we need extrinsic evidence, isn't it? No, Your Honor. The defendant stated that in terms of what we do, we send letters, we make calls, we report to credit bureaus. The natural meaning of collection activity, as found in multiple cases, includes credit reporting. It is, if you look at the letter, what types of collection activity are referenced. The only specific thing that is mentioned is credit reporting. Restoration of service is not strictly collection activity, and nothing else is mentioned. So I think this letter is crafted, and in connection with the March letter, crafted to convey that the credit reporting is part of the collection activity, and that the purpose of the letter is to get the consumer to pay either in full or a settlement, because they wish to avoid having their credit dinged. That threat had already been carried out by the time the letter is received, and that meaning is false. Therefore, the letter violates the FDCPA under Pantoja and the line of cases culminating in Pantoja, and the plaintiff should have been granted some re-judgment, not the defendant, unless the court has to act. Are you saving some time for rebuttal? Yes, I would save the remainder of my time. How much time? I saved five minutes. Well, you're in the end of that five minutes, so you can go ahead and do what you want. Thank you. I will do that, Your Honor. Mr. Gallagher. May it please the Court. The two claims that the plaintiff has asserted here are interpretations of a single line in the collection statement, namely the letter serves as notification that your delinquent account may be reported to the National Credit Bureau. The interpretation of that is, based on the plaintiff, can be interpreted two ways. My client interprets it as it is a possibility, and we are authorized to report this to the credit bureaus. The plaintiff interprets it as it has not yet happened, but it may happen. Either of those two interpretations in the reading of this letter are entirely true. So the primary point is that under any of the interpretations offered by plaintiffs, there are still true statements. And as Your Honor pointed out, all of the statements on its face in the letter that the plaintiff has sued on are accurate. And there's been several statements and characterizations regarding the intent behind the use of this language. The purpose of the FDCPA is to curb abusive debt collection practices. The suggestion that putting a consumer on notice that his or her credit may be affected by the collection account is a notice that is helpful to the consumer. It is not a threat. It is not a negative thing to notify the consumer of that fact. In fact, in our brief… But ERC, forgive me, but ERC clearly knows if it will or will not report a debt to the credit bureaus. Why use the word may at all instead of something more definite? Your Honor, because there are circumstances when ERC will not, in fact, report to the credit bureaus. And the deposition testimony of Mr. Davis that was referred to by opposing counsel is that if at any point prior to the date that the account is actually reported, and there could be circumstances where a payment in full is made, there are circumstances when a settlement payment plan are put in place, even if that plan is not yet complete, if it's in place and the account holder, the debtor, is complying with that plan, then it will not get reported. Even if, as opposing counsel referred to it, it was already placed in the process of being reported, that process will be stopped. So is Mr. Edelman incorrect when he maintains that it's true that once a debt has been scheduled for reporting to the credit bureaus, no payment by the consumer will prevent the debt from being reported? Is he incorrect there? Yes, Your Honor, he is incorrect. And we've cited the specific deposition testimony in our brief where he described that that is, in fact, it would be stopped. And I can point, Your Honor, specifically to that testimony. And that is in our brief at page 31. So Mr. Davis testified, so today, as it's always been, if they pay in full or agree to pay the settlement in full prior to the date in which the account is scheduled to credit report, we avoid credit reporting on that account. And he goes on to say that as long as they maintain their monthly or weekly or biweekly or whatever their agreement is that they made, as long as they maintain that agreement and follow through with it, we avoid credit reporting. So if you report delinquent debt according to a particular schedule, why not be specific about that in your letters to consumers? And so they will know when, when, which is, you know, very important, delinquent debt is scheduled to be reported. Your Honor, there's several reasons. And although we've been focusing on the April 21, 2016 letter because that is the letter that the class was based on, there was a previous letter that contained the same language. And collection companies, through their compliance efforts, put enormous time into being careful, because they are regularly in lawsuits like this, to make sure that it is not a statement that is going to be inaccurate. And so the statement in the first letter was 45 days prior to it being reported, 45 to 55. And in between that time, a number of things can happen. A bankruptcy could be filed. The consumer could report the debt. The account could get recalled by the creditor. A settlement plan could be made. And, you know, we've been focusing on communications by letter, but my client contacts account holders by telephone and communicates by telephone much more frequently than it does by letter. And so communications can take place in between then, where the debtor may say, no, this is not my account. That is not my Social Security number. There could be fraud claims. There's any number of circumstances which would interrupt that process. And so, in addition, if this is a first letter that the plaintiff receives, if we make a threat that we are going to report on a specific day and that falls within the 1692G 30-day validation period, then you have an overshadowing claim. And so there are all of these various pitfalls that putting in a specific date can get the collector in trouble, which goes to the safe harbor language that the Seventh Circuit requires about we're not obligated to renew this offer. And so this court recognizes that a consumer can put undue value on a date or suggestion in a letter. And so there are many legal reasons why it's dangerous to go that route and, in fact, may suggest to the plaintiff an occurrence that may not occur. And so this information that we're providing is, in fact, helpful information for a consumer. A consumer wants to know if this is going to affect their credit. And as Your Honor pointed out, most of the unsophisticated consumer would likely know that anyway. But, you know, the FCRA, and again, it's not a requirement that our client provide this, but the FCRA requires other institutions to notify. Why? Because it's helpful for the consumer. It's good for the consumer to know so that they can dispute it, so that they can take action. The State of California also requires it, and they require a specific statement along these lines that's either before it's been reported or within 30 days after it being reported. And so the characterization of this as a collection tool, as a threat, or as some type of abusive practice, I think we need to start from the point that it's a positive thing to have this language in there. And so I want to turn to the various interpretations. The first one is that it is permitted for ERC to report on the credit. That is a 100% accurate statement. The second statement or interpretation offered by plaintiff is that it has not yet been reported, but it will be reported. That also is a 100% accurate statement, both in the first letter that was sent as well as the only letter at issue here, the April 21, 2016 statement. And so, again, even if you accept the plaintiff's interpretation on that issue, there's no violation because it was not misleading. It was not deceptive. It was a true statement. If you would turn to the juxtaposition of the two sentences in the letter that are at issue here, so far you've been focusing on the first one in isolation. And so I would reiterate what Judge Rovner indicated, that these are three independent statements within the letter. It is a settlement offer, which says it doesn't say make a payment by May 26th. It says please remit by May 26th. And then you also have the we are not obligated to renew this offer, which is the safe harbor language that the Seventh Circuit has promulgated. And then in a separate paragraph, it says this letter serves as a notification that your delinquent account may be reported to the National Credit Bureau. Again, that is something that ERC believes the consumer should know. And then it goes into an explanation of what will happen if you accept the above settlement offer. It is not a if you don't take it, this is what's going to happen. The context of that paragraph is if you accept the settlement offer, here's what's going to happen. Collection activity will stop. In the unsophisticated consumer, in their mind, the collection activity would be they're not going to get letters, they're not going to get calls, they're not going to get bugged. The issue will go away. And then the other consequence of accepting a settlement offer as opposed to paying in full is explained here. It says that we will inform Sprint that it has been resolved, but unless it's paid in full, you will not be able to renew service with Sprint. And so we offer a very different view of this, that it's an offer of settlement, it's a notification that their credit could be reported, and then it talks not about a threat of reporting if you don't settle, but here are the consequences of accepting a settlement. And in our view, that's the only reasonable interpretation of this. Isn't it reasonable to infer that an unsophisticated consumer would interpret the two sentences, the one about your delinquent account may be reported to national credit bureaus, and the following sentence, that payment of the offered settlement will stop collection activity, for an unsophisticated consumer to understand that accepting the offer, the settlement offer, will halt the credit bureau reporting? I think, again, that that is a very sophisticated interpretation of this letter that I think plaintiffs' counsel can articulate very well, but I don't believe that an unsophisticated consumer could articulate well. But, again, I would go back to the fact that based on the deposition testimony of Jason Davis, if a settlement is accepted before the reporting occurs, it would, in fact, stop the credit reporting. So, again, that is a true statement. But it doesn't stop credit reporting that has already occurred, obviously. That's correct. So that's the theory of how this is misleading, but as the district judge said, in this case, that requires extrinsic evidence. Because this could be interpreted reasonably in a variety of ways. So it's not a Category 1. It's not a Category 3. It's in the middle, requiring extrinsic evidence. Right, and not only would it require extrinsic evidence, but it would require proof. So the question about what is the proper way to say this, or should we have said in this letter it has already been reported? Absolutely not. I guarantee you that ERC would be sued if it sent a letter that said this has already been credit reported and it wasn't reported for another six or seven days. Why is that important? Because then, in the mind of a consumer, say he gets this letter before it's reported. That is going to affect his or her decision making because he says, well, it's not important for me to address this now. The damage has already been done. And that is one of the key aspects in the FDCPA is if a statement, a misleading or false statement affects a consumer's decision making, then it is violative of the FDCPA. So that alternative is not available. The next alternative, suggesting that it may be reported imminently or it will be reported imminently, again, gets into timing issues that cause all sorts of problems under the FDCPA. So in our view, any offered alternative to this very benign statement is only going to lead to additional violations. And I think one of the key authorities that we've cited to that we rely on is the Dunbar v. Cohn law firm. And in that case, it was a similar statement where a collector used the phrase that acceptance of the settlement may have tax consequences. And they focused on what does may mean there. Are they threatening to send in a 1099 forgiveness of debt? And then there was the argument that they didn't have the authority to do that. And so they got into how should we interpret may. And even though the Seventh Circuit acknowledged that there are alternative interpretations to may, meaning that it's a possibility versus it will happen or a future possibility, and it may have implications on what conduct the collector may carry out, the court said that the use of the word may does not compel a conclusion that the statement is deceptive, even if there are these alternative interpretations that are possible. And that was a dismissal of the plaintiff's claim on the pleadings, which is what we have proposed here. We believe that not only should summary judgment have been granted, but that the motion to dismiss should have been granted in the beginning. And I wanted to address the opposing counsel addressed the Puntoya case. That was a very different scenario where the collection letter proposed a settlement payment plan. And the problem with that proposal was that it was a trap, because once the debtor made a settlement payment, that then renewed the statute of limitations. So it wasn't the alternative issue that was the problem. It was the fact that it was a trap. Thank you for your time. Thank you. Mr. Edelman. Your Honors, the consumer wants to know whether they can avoid having their credit damaged. The problem is that by the time the consumer receives this letter, reporting will have taken place. The letter is dated on a Thursday. Assuming it went to the mail the same day, they would have to get it the next day, which is unlikely nowadays, and act upon it instantly, which is simply not going to happen. The reporting took place on Sunday. Incidentally, the same language was repeated in the June letter, which is a month and a half after reporting had already occurred. So they're not being careful as to misleading people. If the credit reporting was not meant to be an inducement to pay the money, it wouldn't have been in there. It is not required, and the purpose of this was to convey save your credit by paying money. There is no overshadowing issue. The testimony was that they wait 33 to 45 days. There is a date for payment specified in the letter. It is always 33 to 45 days after the date of the letter, avoiding any such problem. There's no safe harbor issue. Every language is intended to protect defendant against a claim that if we make the same or better offer later, that it was misleading not to disclose the limits in our settlement authority. It has absolutely nothing to do with this case. Dunbar is also very different. In Dunbar, the court found that there was nothing misleading about saying that a settlement may have tax consequences. The action being described was the action of the Internal Revenue Service based on information which the debt collector did not have and both the debt collector and the consumer knew the debt collector didn't have, namely their financial circumstances and the content of their tax return. Since it was possible but not certain, may was found appropriate. It was not found to be ambiguous. It was just found not to be misleading. The issue as to extrinsic evidence, I think, is wrongly stated by the defendant. Extrinsic evidence is necessary where the judge doesn't see a claim in the letter, but it is contended that the unsophisticated consumer would place a meaning on it that is not clear to the judge. For example, in the briefs cited a case called Pettit v. Retrieval Masters Creditor's Bureau. The claim was that a creditor's bureau would be misread to mean credit bureau. It's not apparent from a careful reading of the letter, but somebody who is careless and not careful with the English language might put that meaning on it. The court said that you need a survey to establish that. This isn't the sort of letter. Here, the meaning that we contend for, namely that you can avoid damage to your credit by payment, is evident on the letter. The district court so held in connection with the motion to dismiss, and it is a reasonable meaning. Since it is not a true meaning, the plaintiff should have prevailed. All right. Thank you. Our thanks to both counsel. The case is taken under advisement, and the court will take a brief recess. Thank you.